WILMER REDDY, RESPONDENT, v. JOSEPH GARAVELLI, INCORPORATED, A CORPORATION, APPELLANT.—102 S. W. (2d) 734.

St. Louis Court of Appeals. Opinion filed March 2, 1937.

*Anderson, Gilbert, Wolfort, Allen & Bierman* for appellant.

*Jones, Hocker, Gladney & Jones, Web A. Welker* and *Arnot L. Sheppard* for respondent.

BECKER, J.—This is an action for damages for alleged personal injuries to plaintiff. On the trial of the case a verdict and judgment resulted in favor of plaintiff for $15,000. Upon the trial court indicating its intention of granting a new trial unless plaintiff would remit $7500, because in its opinion the verdict was excessive, plaintiff made such *remittitur* and from the judgment for $7500 defendant in due course appeals.

Plaintiff Reddy, when injured, was in the employ of the Highland Dairy Farms Company, a corporation, which company and plaintiff had accepted the provisions of the Missouri Workmen's Compensation Act and Reddy had been granted and accepted the sum of $1223 in full settlement of his claim for compensation thereunder.

The present action is prosecuted by plaintiff for his own benefit as well as the benefit of the insurer, Travelrs' Insurance Company, and the employer, Highland Dairy Farms Company, as their interest may appear, in that said Highland Dairy Farms Company and the said Travelers' Insurance Company had become subrogated to the right of action which plaintiff had against defendant under section 3309, Revised Statutes of Missouri, 1929 (Mo. St. Ann., sec. 3309, p. 8244), a third party and the alleged wrongdoer, but had refused to join in this action as parties plaintiffs.

Plaintiff was an employee of the Highland Dairy Farms Company and it was his duty to make delivery of milk to defendant's cafe, and on June 27, 1932, in performance of his duty in delivering milk to the defendant, and while in the act of or attempting to use a stairway at the rear of the defendant's premises provided as a means of ingress and egress to and from the basement door of the premises, and while using said stairway, plaintiff slipped on the same, causing him to fall headlong down the stairs, causing him injury.

As to the negligence charged in the petition it is sufficient for

the purposes of this opinion to state that plaintiff in his evidence relied upon the charge that defendant operated, in connection with its cafe, a suction fan which carried greaseladen air out of its kitchen, which was in the basement, and deposited it on the flight of steps which plaintiff was compelled to use in delivering milk for his employer, thereby rendering the steps slippery and dangerous.

Defendant's answer was a general denial and a plea of contributory negligence.

At the trial, upon the close of plaintiff's case, defendant offered a demurrer, which was overruled. The defendant stood upon its demurrer and offered no evidence.

In light of the disposition we make of this case it is necessary to advert only to the assignment of error that the trial court erred in refusing to give and read to the jury the instruction in the nature of a demurrer to the evidence offered by defendant at the close of plaintiff's case on the ground that plaintiff's evidence conclusively developed the fact that whatever dangerous condition, if any, existed on defendant's premises was as well known to plaintiff as it was to defendant, and that consequently there was no evidence establishing any breach of duty on the part of defendant.

Plaintiff's evidence discloses that on the 29th day of June, 1932, he was employed by the Highland Farm Dairy Company as a route rider. A route rider is one who substitutes for regular delivery men on the days the regular men are off duty. On the day in question he was making a delivery at defendant's place of business located at the northwest corner of De Giverville and De Baliviere avenues in the city of St. Louis. He entered defendant's premises through a gate leading from the sidewalk to the areaway between two buildings and started down a stairway at the rear of the main building, which stairway led to the basement. He had negotiated from one to three steps of this stairway, which was constructed of concrete, when he slipped and fell head forward down the steps, because of grease on the steps. The plaintiff described the steps as being about three feet wide, with ordinary treads of from eight to ten inches and a riser of about six or seven inches. The total number of steps in the flight was from twelve to thirteen. Previous to the day of the accident plaintiff had been making delivers to Garavelli's over a period of from four to five years; these delivers were made on two days out of each week. On the days he made delivers he would call at Garavelli's from one to three times per day.

Plaintiff testified that he had slipped on these steps before, but had never been injured. Plaintiff testified that there was a suction fan located about halfway down the steps, and on the east side thereof, which fan drew off steam from the kitchen; that he called it grease because it was caked all over the blades of the fan, and he did not know of anything except grease that would stick on the

blades of the fan. This fan was located behind the stoves in the kitchen which was located in the basement, and the purpose of the fan was to draw fumes from the basement.

With reference to plaintiff's knowledge of the condition of the steps in question we set out his own testimony relating thereto.

Direct examination.

"Q. Had you ever previous to that, noticed the condition of those steps? A. I slipped on those steps and fell down before, but I always was lucky enough that I sat down and went down.

"Q. Did you ever notice the condition of them previous to that, anything on them? Anything of that sort? A. Yes, I have noticed grease on the steps. I was always careful of them."

Cross-examination.

"Q. Now, then, you slipped on some grease you say? A. Yes, sir.

"Q. Did you see that grease? A. Yes, sir.

"Q. At that time? A. Well, it is almost invisible to the eye. I knew the grease was there. I had been making deliveries there so long. I have always expected it.

"Q. You knew it was there? A. The grease was always on those steps.

"Q. And you were expecting to fall? A. I was always extra careful on those steps.

"Q. The reason, now, you say you fell on grease this time was because you knew it had been there on other occasions? A. No, sir. I didn't say that.

"Q. You didn't see it this time, did you? A. After I slipped on it.

"Q. You didn't notice any foreign substance of any kind on these steps when you started down? A. Foreign substance?

"Q. Yes, grease or anything like that? A. At the time I started down them?

"Q. Yes? A. I didn't until my heel slipped.

"Q. Well, when your heel slipped, you went right on down them —you didn't see anything then, did you? A. Yes, I had time to see that. My heel slipped about four or six inches.

"Q. While your heel was slipping you saw the grease? A. Yes, sir.

"Q. Was that the same kind of grease you seen on them before? A. That grease was almost invisible. That fan sucks that grease out of there and it is just a mist over those steps.

"Q. But that is the same kind you had seen there before? A. Yes, sir.

"Q. Whatever grease comes out of that fan goes on the fifth or sixth step, doesn't it. A. It goes all over all the steps. It goes all over the steps. It is as high as the top step.

"Q. And you knew that? You had seen those steps greasy clear to the top? A. Yes, sir.

"Q. Before you fell? A. Certainly. I never seen the grease on them that morning. You said did I see them greasy. I have seen them greasy to the top.

"Q. Before this happened, before you fell I mean, on days before you fell? A. Yes, sir, on days before I fell I have, yes, sir.

"Q. You mean days before that you had used the steps to deliver milk? A. The day before that.

"Q. Were they greasy that day? A. I never paid any attention because I was always too careful on those steps. I knew what they were.

"Q. And you knew they were greasy? A. Yes, sir."

Recross-examination.

"Q. The step was greasy clear to the edge, wasn't it? A. I expect it must have been. I didn't stop sliding.

"Q. Well, you knew it was greasy, didn't you, clear to the edge? A. I expect it was. It couldn't be no other way with that fan there."

Redirect-examination.

"Q. As you stepped down there that morning to take that milk down, did you know that morning that those steps were as greasy as they were? A. No, if I had knew they were that greasy I wouldn't have went down there. I knew the steps had always been greasy and I was always careful. If I had knew they were that greasy that morning I wouldn't have went down there at all."

Witness for plaintiff, one Herman Lampert, testified he had been a driver for the Highland Dairy Company for eleven years and was working for them at the time plaintiff met with his injury.

Cross-examination.

"Q. How often would you go to Joe's? A. Every day.

"Q. Every day for nine years? A. Yes, every day.

"Q. And delivered down those steps every day for nine years? A. Yes, sir, every day.

"Q. Those steps were greasy during that whole time? A. They were.

"Q. Always from the fan? A. They were.

"Q. And the fan had been there the whole time? A. Yes, sir."

The only other witness adduced by plaintiff was Dr. John Albert Key who examined plaintiff on October 3, 1932, and again on September 18, 1934, at the request of the Traveler's Insurance Company. His testimony relates to plaintiff's injuries and his condition at the time of the trial.

No evidence was adduced on behalf of defendant.

There is no contention but that plaintiff was an invitee and therefore the facts of the instant case are to be determined by the ruling

as to the duty and liability of an owner or occupier of land to his invitee.

In the very recent case of Paubel v. Hitz (Mo.), 96 S. W. (2d) 369, our Supreme Court, division two, had occasion, on facts quite similar to those in the instant case, to review the various cases dealing with the reciprocal legal duties and rights of the possessor of lands and persons coming thereon, and clearly pointed out that ''such duties and rights are affected, among other factors, by the legal relationship existing between the parties (such as where the party on the premises is a trespasser, a distinction existing between adults and young children in some instances, a licensee, whether by invitation or permission, a business invitee, visitor or guest for mutual benefit or the possessor's benefit, a person privileged to enter thereon for public or private purposes); and by the nature of the business conducted (whether of a public or private nature) or dangers attendant upon the use made of (whether reasonably safe or inherently dangerous) the premises; and by the object and purpose of the person's presence on the premises; and whether the duties imposed on the possessor arises under the common law, or are supported by contractual relation, or statutory or ordinance provisions. In the different cases these factors have been given consideration as the facts called for the application of one or the other of the several rules of law. Generally speaking, the legal duties imposed on the possessor increases or decreases with the beneficial interest of the possessor in the presence of the other on the premises; and as a corollary, corresponding shifts occur in the legal rights of the party on the premises.''

The facts in Paubel v. Hitz, disclose that Paubel was a United States postman or letter carrier and that the defendant Hitz conducted a place of business in the city of St. Louis on what is commonly known as ''Commission Row.'' Leading from the street and sidewalk curb to the door of the Hitz place of business was a wooden runway. Just inside the door was a desk upon which it has been Paubel's custom, for over a year, to place the mail when delivering it to Hitz' place of business. Paubel testified that on the morning of his injury said runway was covered with chicken manure, snow, ice and slush, which rendered it very slippery; that that was its usual condition; that on the morning that he met with his injury he had walked up the runway, had seen that it was covered with foreign substances, and for that reason he ''took great care in doing it, as I saw that it was slippery, wet and full of manure and chicken dirt.'' As Paubel was going back down the runway after delivering the mail, his foot slipped and he fell and was injured. In light of plaintiff's testimony the court held that the maintenance and use of the runway at defendant's place of business was common to the commission houses in that vicinity; that no hidden,

lurking or secret peril was involved; that whatever danger existed was not only obvious but actually and particularly known to plaintiff; that plaintiff possessed all the information concerning the physical condition of the runway possessed by defendant or his employees, and knew of and appreciated the care required to use it. The court ruled that had plaintiff been warned of the slippery condition of the runway no greater information would have been imparted to him than that which he admittedly possessed; and that since a warning imposing notice of the condition of the runway would have discharged defendant's legal obligation; therefore, whatever risk existed incident to passage over the runway was voluntarily incurred by plaintiff—*volenti non fit injuria*—and that defendant breached no legal obligation owed plaintiff.

In Vogt v. Wurmb, 318 Mo. 471, 300 S. W. 278, our Supreme Court, division one, in the course of the opinion stated the rule as to the duty of the owner or occupier of land to an invitee as follows:

"The owner of lands is liable in damages to those coming thereon, using due care, at his invitation or inducement, express or implied, or any business to be transacted with or permitted by him, for any injury occasioned by the unsafe condition of the premises, which is known to him and not to them, and which he has suffered negligently to exist, and of which they have received no notice. [Main v. Lehman, 294 Mo. 579, 243 S. W. 91; Mullen v. Sensenbrenner Merc. Co., 260 S. W. 982; Welch v. McAllister, 15 Mo. App. 492; Donaldson v. Wilson, 60 Mich. 86; Calvert v. Springfield Light Co., 231 Ill. 290; Bennett v. Railroad, 102 U. S. 577, 20 R. C. L. 56, par. 52.]"

The following quotation from 20 R. C. L. 56, paragraph 52, is cited with approval in both the Vogt and Paubel cases:

"The mere ownership of land or buildings does not render one liable for injuries sustained by persons who have entered thereon or therein; the owner is not an insurer of such persons, even when he has invited them to enter. Nor is there any presumption of negligence on the part of an owner or occupier merely upon a showing that an injury has been sustained by one while rightfully upon the premises. The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted. . . . And, hence, there is no liability for injuries from dangers that are obvious, or as well known to the person injured as to the owner or occupant."

And the following is from 45 C. J., sec. 292, p. 868:

"No precautions are necessary where the danger is obvious and unconcealed or known to the person injured or where it was the duty of the person injured to do the thing, failure to do which caused the injury."

And the following from 45 C. J., sec. 306, p. 87:

"Notice or warning is not necessary where the danger is obvious, or the person injured has actual knowledge thereof, or where, on account of the obviousness of the situation and the use of the property for a considerable time by the person injured, the owner has a right to believe that the injured person has full acquaintance with the situation and the risk."

Examining the record before us in light of the authorities, supra, we find that plaintiff himself testified that during all the years he had been delivering milk to defendant he knew that grease was on the steps, grease that "is almost invisible to the eye. I knew grease was there. I had been making deliveries there so long. I have always expected it. . . . The grease was always on the steps. . . . I was always extra careful on those steps. . . . That grease was almost invisible. That fan sucks that grease out of there and it is just a mist over those steps. . . . It goes all over all the steps." And with reference to the condition of the steps the day before plaintiff met with his injuries, plaintiff testified, "I never paid any attention because I was always too careful on those steps. I knew what they were;" that he knew the steps were "greasy clear to the edge. . . . It couldn't be no other way with that fan there."

To this testimony of plaintiff himself we must add the corroborative testimony of his only witness as to the steps and their condition, namely, Herman Lampert, who stated that he had delivered milk to defendant for nine years and that the fan was there, and that "those steps were greasy during that whole time," and also that" . . . every fellow that went there was told by different drivers to watch those steps on account of the grease," though he himself had never told Reddy about that.

Upon the record as we have outlined it, we can but conclude that the defendant had no knowledge of the condition of the steps and the danger therefrom superior to that of plaintiff when he began his descent of the steps, for what plaintiff then saw disclosed to him all the information that the defendant or its employees could have possessed, and that too, notwithstanding that plaintiff testified that he had not seen the grease on the steps that morning and that if he had known they were "that greasy" he would not have gone down the steps, for the reason that that statement must be taken in connection with the other positive testimony of plaintiff that because of the use of the suction fan he knew the steps had always been greasy, and that the grease on the steps was almost invisible, and that he was always careful. How well plaintiff knew the condition of the steps is best evident by his answer to the question whether the steps were greasy the day before the one on which he had met with his injuries, his answer being: "I never paid any

attention because I was always too careful on those steps. I knew what they were.''

In light of the facts as they appear upon the record before us, and under the decisions of our Supreme Court set out hereinabove, the trial court erred in overruling defendant's demurrer offered at the close of plaintiff's case. It follows that the judgment should be and it is accordingly reversed. *Hostetter, P. J.*, and *McCullen, J.*, concur.