Augustus R. Kellogg, Respondent, v. H. D. Lee Mercantile Company, a Corporation, Appellant.—160 S. W. (2d) 838.

Kansas City Court of Appeals.   February 16, 1942.

*Cowgill & Popham* and *Sam Mandell* for appellant.

700

*Marcy K. Brown, Jr.* for respondent.

CAVE, J.—This is a suit for personal injuries. For convenience, we will refer to the parties as plaintiff and defendant. The plaintiff first joined as defendants H. D. Lee Mercantile Company, a corporation, and trustees of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company, but later dismissed as to the defendant railroad company, and the cause was tried against the Lee Mercantile Company alone, resulting in a verdict for the plaintiff in the sum of $2000. Appeal was perfected to this court in due course. The defendant did not introduce any evidence and is urging but one point on the appeal, viz., that the court erred in refusing to sustain its demurrer to the evidence, because plaintiff's evidence showed, as a matter of law, (a) that the defendant was not guilty of negligence; (b) that plaintiff was guilty of contributory negligence; (c) that plaintiff voluntarily incurred the risks incident to his work.

This will necessitate a detailed statement of the evidence. Plaintiff was employed by the railroad company as a yard conductor or switching foreman and, as such, was in charge of the crew engaged in the switching operation hereinafter mentioned. Defendant owned and operated a warehouse, located on the south side of Twenty-First at Wyandotte Street in Kansas City. At the southeast corner of this building two sets of railroad tracks run into the building from the south with a concrete dock about four feet high, located between the two sets of tracks and is used for loading and unloading defendant's merchandise. The east railroad track has not been used for

a number of years. The west track is the one used for cars and is the one involved in this accident. It is long enough inside of the building to accommodate three ordinary railroad cars. On the concrete dock are ten concrete pillars used to support the building; these pillars are approximately sixteen feet apart and set back about sixteen inches from the west edge of the dock. The loading dock belonged to the defendant. The ceiling above the dock was fourteen and one-half feet high and there were five or six electric lights in the ceiling just east of the pillars. In placing the cars for unloading merchandise onto the dock the plaintiff, as such foreman, would have the cars backed into the building on the west track, which would make the cars traveling north. It was plaintiff's custom to ride on the top of the car first entering the building and at the northeast corner thereof in order to signal the engineer where to stop that car so that its doors could be opened without interference by any of the concrete pillars. When the first car was placed the plaintiff would descend onto the dock and walk along the west edge of the dock to uncouple that car and then move the next one in place, and when that car had been properly located, would move along the dock to uncouple the other cars. He had been doing this work in this building almost every day, except Sunday, for almost twenty years. The top of the dock was approximately level with the floor of the freight car, and there was sixteen inches between the side of the car and the side of the dock. Plaintiff testified that it was his custom to walk along the top of the dock to uncouple the cars because the space between the dock and the cars was so narrow that he could not comfortably move along there without danger of tearing his clothing or being injured, and only got down on the ground between the dock and the car in an emergency.

It was the custom of defendant's employees to unload the cars and place the merchandise, which was in pasteboard cartons, on the dock and between the pillars. Sometimes the merchandise, so placed, was two feet high and at other times it would be five or six feet high and usually took up practically all of the space between the pillars so that a person could not walk along the dock to the east or behind the pillars and then enter at the proper place to uncouple the cars. During the twenty years plaintiff had been performing his duties at this plant, defendant's employees had frequently placed the merchandise outside of the line of the pillars and nearer the edge of the dock, and that when the merchandise was from four to six feet high it would obstruct the direct light from the electric lights and cast a shadow along the edge of the dock where it was plaintiff's custom to walk; that he knew this and he had frequently complained to defendant's employees of such practice; that when he would complain such conditions would be improved for a few days but soon the merchandise would again be placed near the edge of the dock and at

702

such a height that it would cast a shadow along the space where he walked.

The plaintiff also testified that on the day of the accident he rode into defendant's building on the lead car, as was his custom, and that he was looking to the north to see that the car did not strike a bumping post near the north wall; that he paid no particular attention to the loading dock as the cars entered, but did notice some merchandise on the dock; that when the first car was placed he came down from the top of the car onto the dock with the intention of going forward to uncouple that car; that the length of the car was approximately forty-two feet.

Concerning what occurred at the time of the accident, we now quote plaintiff's own testimony; on direct-examination he testified:

"Q. You had a distance of forty feet to walk on the edge of the dock in order to get down to make your uncoupling? A. Yes, sir.

"Q. As you went down there did you notice anything about the merchandise that was piled up there? A. When I got down I noticed there had been merchandise piled along in between the pillars of the building and they piled it outside of the line of pillars.

"Q. Where was this? A. The middle of the car.

"Q. Was it different than it was the day before? A. Yes, sir.

"Q. Was the merchandise higher? A. Yes, sir.

"Q. How much higher? A. The merchandise was piled five or six feet high and—

"Q. (Interrupting) At that point haw far outside of the line of the pillars was it? A. That only left about eight or ten inches to the edge of the dock.

"Q. You had at that point, when you first encountered it, about eight or ten inches between the edge of the dock and the merchandise? A. About eight or ten inches between the edge of the dock and the merchandise.

"Q. It was piled out beyond the pillars? A. Yes, sir.

"Q. When you encountered that situation what did you do? A. Well, I put my hand up along the side of the car to brace myself to get along.

"Q. Did you observe where you were going? A. I did.

"Q. Did you observe carefully the steps you took? A. I couldn't with the lights that was provided.

"Q. What was the condition as to the light? A. The light was all in darkness midways from the shadows of the merchandise being so high.

"Q. Was there any other way for you to get down to that car to uncouple it? A. No, sir.

"Q. Is that the usual and customary way you always did it? A. Yes, sir.

"Q. Is that the way that the H. D. Lee Company and the warehouse foreman knew you worked? A. Yes, sir.

"Q. Had he seen you do that many times? A. Yes, sir.

"Q. Did you ever get down on the track level and walk along there to make your uncoupling? A. Not unless I had something very special because I wasn't tearing my clothes off trying to get through there.

"Q. That was the usual and customary way of walking along the edge of the dock? A. Yes, sir.

"Q. You say you held your arm up the side of the car? A. Yes, sir.

"Q. And walked forward with the merchandise on the lefthand side? A. Yes, sir.

"Q. And you say at that point it was about eight to ten inches to the edge of the dock? A. Yes, sir.

"Q. Did the lights illuminate the edge of the dock? A. No, sir.

"Q. You were going into a place a little dark and a little cramped? A. Yes, sir.

"Q. And will you tell the jury how you went about that? A. I went very slow, bracing myself so as to keep from falling.

"Q. And did you look where you were going? A. I looked the best I could.

"Q. Did you feel your steps along? A. I did.

"Q. All right, tell the jury how fast you were going? A. I was going very slow.

"Q. Did you have any occurrence? Did anything happen there? A. Well, about three quarters length of the car they finally pushed the groceries out so I hit it with my left foot and knocked my foot off the dock.

"Q. You hit what? A. A package of some groceries.

"Q. You mean one of the cartons? A. Yes, carton of groceries.

"Q. What foot did you hit it with? A. My left foot.

"Q. Was that on the floor of the dock? A. It was.

"THE COURT: Just a moment. Were those cartons evenly piled there?

"THE WITNESS: Well, no, they had sloped out to the edge of the dock more.

"Q. Now, was the carton you stumbled against farther out to the edge of the dock? A. It was.

"Q. Than the cartons you had been walking along prior to the time you slipped? A. It was.

"Q. How far out was that carton you stumbled over? A. About five or six inches from the edge of the dock?

"Q. And it had other cartons piled on top of it? A. Yes, sir.

"Q. To what height? A. Well, I would say about four foot but

the shadows of the lights, being piled up in the openings between the pillars, left it in darkness so that you couldn't see it.

"Q. Was merchandise piled between those pillars to take up the whole distance between the pillars at that point? A. Yes, sir.

"Q. Was there a passageway back of the pillars? A. The only passageway was on the outside and you couldn't get in there to make your uncoupling of the car.

"Q. In other words, you mean to tell the jury these cartons of merchandise took up the whole available space between the pillars along that point? A. Yes, sir.

"Q. Did you, or did you not, see this carton you fell against prior to the time you fell? A. No, sir.

"Q. When you saw it you estimated it was five or six inches from the edge of the dock? A. When I fell.

"Q. You mean before or after? A. After I fell."

On cross-examination he gave the following testimony:

"Q. You went in there along this track sitting up there on this front car you looked along there to see what the condition was, didn't you? A. I seen that stuff piled up there, yes.

"Q. And you saw stuff piled up there? A. Yes, sir.

"Q. Along the dock? A. Yes, sir.

"Q. And you saw trucks on one side and merchandise piled up on the other side? A. That's true.

"Q. You noticed that as you went in there? A. Yes, you would see that out of the corner of your eye.

"Q. And you say the reason you noticed it was because it was right in front of your eyes, is that right? A. Yes, probably.

"Q. And you noticed that when you were looking out ahead down this track before you got off the car, didn't you? A. Yes, sir.

"Q. Now, do you tell the jury, Mr. Kellogg, that this condition that you say you touched there with your foot, was a new condition, an unusual condition? A. It had been put there in the last twenty-four hours.

"Q. But it wasn't an unusual condition in the years of your work, was it? A. Yes, it was; it was as close as it had ever been from the time the building was put up that I ever remember of.

"Q. You made a report to the railroad company in writing and signed your name on each page of your own report? A. That is true.

"Q. I want to call your attention to this langauge in your report. Don't you know that much of the time you saw the same situation that you claim existed this morning? A. No.

"Q. And you claim that most of the time before you had seen nothing between the pillars at all, is that what you claim? A. Not to speak of.

"Q. That is. what you are claiming? A. Yes, sir.

"Q. Now, let me read part of your own language that you made in your own report. (Reading.) 'It has been the custom for about twenty years past for employees of the Lee Company to pile merchandise on this platform in piles six to seven feet high, generally the stuff is piled about even with the pillars but most—(most is crossed out)—and that was done before you signed it? A. Yes, sir.

"Q. (Continuing reading): 'But much of the time in behind the pillars.' Now, you signed that, didn't you? A. Yes, sir.

"Q. That was true, when you put it in your report and signed your own name? A. That is true but—

"Q. With reference to your statement that this was a new and unusual condition, I want to read this portion of your report, over your own signature. 'In order to walk along the edge of the platform, in the space between the piled merchandise and the cars it was necessary to lean on the side of the car, placing a hand against the car to balance yourself and feel the way with your feet. This condition is nothing new or unusual, it has been that way for years.' That was true? You answered that, didn't you, you said 'Yes'? A. Yes, I did.

"Q. I notice here again in your report next to the front page this language. 'Because of the merchandise piled so close to the edge of the platform, 6 to 7 inches, I had to grope my way although this was nothing new.' That was true when you put it over your signature? A. It was nothing new.

"Q. Let me finish my question. This statement you wrote and signed and reported to your company was true when you made it, wasn't it? A. It was nothing new where it was piled prior—

"Q. (Interrupting): I asked you if the statement was true? A. Yes, sir."

Plaintiff's witness, White, who was a member of his crew, testified substantially as plaintiff had and corroborated the fact that when the merchandise was from three to six feet in height the edge of the dock was in shadow and it was dark, and that that was the usual condition of the dock; that he had many times seen the merchandise "within four or five inches of the edge of the platform;" that he had frequently complained to defendant's employees of the condition and had heard the plaintiff complain to them.

W. C. Bennett, another member of plaintiff's crew, testified substantially to the same facts and that such condition had existed for more than twenty years, to his knowledge.

In determining whether the trial court erred in refusing to sustain defendant's demurrer to the evidence, we must take plaintiff's evidence as true unless it is clearly unreasonable or in conflict with established physical laws and give plaintiff the benefit of every reasonable favorable inference deductible therefrom. This doctrine is so universally recognized and followed that we need not cite authority in support of it.

In substance plaintiff's petition charged negligence against the defendant because defendant had negligently piled cartons of merchandise on its dock along and upon which plaintiff had to walk to uncouple the cars which were being placed for the plaintiff at its dock; that said cartons were piled from four to six feet high between a line of pillars which were located approximately sixteen inches back from the edge of the dock and that the lights provided by the defendant did not properly light the edge of the dock, and that, at the point where plaintiff fell, the defendant had carelessly placed a carton of merchandise outside of the line of the pillars and within five or six inches of the edge of the dock, without warning to the plaintiff, which condition rendered the dock dangerous to walk upon and caused plaintiff to fall. The answer was a general denial, coupled with a plea of contributory negligence, in that plaintiff knew, or could have known, of the conditions there existing, and could have taken another course to uncouple the cars, and that he knew or could have known of the condition of the dock and failed to use ordinary care for his own safety and protection.

It is essential to a proper determination of this case that the legal relation of the parties to each other be accurately determined. The plaintiff, at the time of his injury, was on the premises of the defendant under the implied invitation of the latter to perform services for it, viz., that of placing cars "being delivered to the defendant at its loading and unloading dock." He became, under such circumstances, an invitee of the defendant. The rule in regard thereto is to the effect that one who goes upon the premises of another, by that other's invitation and for that other's purpose, is an invitee, and the duty of that other is to take ordinary care to prevent his injury. [Solomon v. Moberly Light & Power Co., 303 Mo. 622, 262 S. W. 367; Cash v. Sonken-Galamba Co. (Mo.), 17 S. W. (2d) 927.] It is also well settled that the owner or occupant of the premises is not an insurer of the safety of an invitee and is not required at his peril to keep his premises absolutely safe. The measure of his duty in this respect is to exercise ordinary care to keep the premises in a reasonably safe condition. [Vogt v. Wurmb, 318 Mo. 471, 300 S. W. 278; Evans v. Sears, Roebuck & Co., 104 S. W. (2d) 1035.]

The defendant contends that it was not guilty of negligence and argues that the evidence discloses that the plaintiff had full knowledge of the conditions which existed along the dock at the time he was injured, and that he fully appreciated the danger, and that defendant did not have any superior knowledge to plaintiff's of the conditions. For the reasons hereafter given, we do not believe the evidence in the record discloses a state of facts which would justify the court in declaring, *as a matter of law,* that the defendant was not guilty in placing the cartons on the dock in the manner the evidence shows it did; or, to declare, *as a matter of law,* that the plaintiff

was guilty of contributory negligence. The evidence discloses that the plaintiff knew of the general condition of the dock as he walked along the edge for the purpose of uncoupling the cars which were being placed for the defendant; and that defendant knew that plaintiff used the dock in performing that service, and had known it for many years. It is true that defendant had, on many previous occasions, unloaded its cartons of merchandise and placed them near the edge of the dock; and that the plaintiff knew that, and had complained to the defendant concerning such condition. But on the day before his injury plaintiff had walked along the edge of the dock in safety because the defendant had not piled its cartons so high as to cast a shadow over the edge of the dock and had not placed any of them in an irregular position; however, on the day of the accident, when plaintiff started to walk along the dock, he could, of course, see that the cartons were piled so high that a shadow was cast on the edge of the dock and interfered with his vision; but he proceeded "slowly" and "watching his steps as best he could," and when he reached the place where he saw the cartons extended outside the pillars, he placed his hand on the side of the car to brace himself as he walked along until his foot struck one of the cartons which was next to the floor of the dock, and which had been placed within five or six inches of the edge and out of line of all of the other cartons. This condition he did not see because of the shadow or darkness, but defendant was charged with such knowledge because it had placed this particular carton out of line with the others. It further appears that because all of the space between the concrete pillars was taken up by the cartons he could not go any other way than the way he did go. Under such facts we are unwilling to say, as a matter of law, that the defendant was not negligent in piling the cartons to a height that would cast a shadow across the part of the dock which they knew plaintiff invariably used and in placing one of the cartons much nearer the edge of the dock than was the general surface of the other cartons. Defendant cites and relies upon those cases which enunciate the general doctrine than when a plaintiff can see and knows the dangerous condition as well as the defendant, then the defendant does not owe him any duty to warn of such condition. Some of such cases are: Vogt v. Wurmb, *supra*; Paubel v. Hitz, 339 Mo. 274, 96 S. W. (2d) 369; Reddy v. Joseph Garavelli, Inc., 232 Mo. App. 226, 102 S. W. (2d) 734; Stoll v. First National Bank of Independence, 234 Mo. App. 364, 132 S. W. (2d) 676; Stoll v. First National Bank of Independence, 345 Mo. 582, 134 S. W. (2d) 97. We have carefully read all of those cases and others cited by defendant and do not believe the facts in this case bring it within the principles announced in such cases. Without reviewing each of those cases, it can be said that the evidence in each one discloses that the plaintiff was thoroughly familiar with and had knowledge of the conditions existing at the

time and place he was injured and that he had as much information about the conditions as he would have had if the owner of the premises had given him notice thereof; that there was no warning of peril necessary; that whatever danger existed was not only obvious but actually known to the plaintiff. We cannot say, as a matter of law, that the evidence in this case presents such a situation. It is true, as we have said, that plaintiff's evidence discloses that when he started to walk along the dock he saw that the cartons were piled at a height which left that portion of the dock on which he must walk in darkness or with a shadow, but he did not know and could not see that the defendant had left one of its cartons extending further out than all of the others and within five or six inches of the edge of the dock and directly in the path which the defendant knew the plaintiff would travel, and had been so traveling many years. It must be kept in mind that darkness is a relative term, and so is looking. [Winters v. Hassenbusch, 89 S. W. (2d) 546.] The evidence discloses that there were five or six electric lights in the ceiling of this room and one large light immediately over the switch track at the north end of the car which was to be uncoupled, and that there were also large doors at the south end which were open to admit the cars, and which would also admit some daylight. Therefore, it cannot be said that the plaintiff was walking into a place utterly black in darkness, such as an elevator shaft; and those cases that hold that for a person to do so is negligence, as a matter of law, do not apply to the facts in this case. The evidence here discloses that there was no defect in the surface of the dock and that the plaintiff knew this by experience. He says he proceeded slowly, watching as best he could where he was going and protecting himself by holding to the side of the car, therefore, we cannot say, as a matter of law, that a person of ordinary prudence would not do as the plaintiff did, a thing he had been doing almost daily for twenty years. The case of Eaton v. Wallace, 287 S. W. 614, 616, announces the rule which, we believe, is applicable to this case, in the following language:

. "The sole question then is whether a person of ordinary prudence would have attempted to descend the stairway in its unlighted condition. Neither this court nor the trial court can say, as a matter of law, upon the facts alleged in the petition, that persons possessing ordinary prudence do not undertake to do such things. The question is clearly one for the jury to pass upon, under the instructions of the court, after it has heard the evidence."

From this and other cases hereinafter cited, we conclude that the rule to be applied to the question of whether a pedestrian is contributorily negligent, as a matter of law, where the pedestrian has knowledge of an unsafe or defective place used by pedestrians, is whether a reasonably prudent person would, under the particular facts, use such a place for walking. The court would not be justified

in holding that a pedestrian was contributory negligent, as a matter of law, in such a situation unless the danger of using the place was so obvious and glaring that a reasonably prudent person would not do so. Under the evidence in this case we are unwilling to so hold. [Condray v. City of Brookfield, 334 Mo. 249, 65 S. W. (2d) 948; State ex rel. City of Cameron v. Trimble et al., 321 Mo. 221; Wyckoff v. City of Cameron, 9 S. W. (2d) 872; Evans v. Sears, Roebuck & Co., *supra*; Megson v. City of St. Louis, 264 S. W. 815; Heberling v. City of Warrensburg, 204 Mo. 604.] In the Wyckoff case, *supra,* the court said:

"The mere fact that plaintiff knew of the defective condition of the sidewalk does not as a matter of law bar recovery on her part. The law in reference to a situation of this kind is stated in Heberling v. City of Warrensburg, 204 Mo. 604, 617, 103 S. W. 36, 40, as follows:

" 'If he (a pedestrian) knows of a defect and it is not so obviously dangerous that no prudent person would attempt to use the street, he may still use the street provided he exercises that care which a reasonably prudent person would in like circumstances.' "

With commendable frankness attorneys for defendant admit they have been unable to find a case "on all four" with the case at bar, but argue that the cases of Curtis v. Capitol State Lines Co., 27 S. W. (2d) 747; Central Publishing House v. Flury et al., 157 N. E. 794; Katz v. Kansas City Development Co., 215 Mo. App. 662, and Eisele v. Kansas City, 247 S. W. 873, will suppore their claim of contributory negligence. We have read those cases and find that the facts are different from those in this case and are not conclusive on the issues confronting us. We fully realize that it is not easy to harmonize all of the decisions in this State on the question of contributory negligence, as a matter of law. Within the confines of certain recognized and well established principles of law, each case must be decided upon its facts.

Defendant next contends that the court committed error in refusing its demurrer because the evidence showed, as a matter of law, that plaintiff voluntarily incurred the risks incident to his work. He cites the cases of Gietz v. McGill, 104 S. W. (2d) 707, and Paubel v. Hitz, *supra.* Those cases are not in point as we understand and have interpreted the evidence in this case. In deciding the Paubel case, *supra,* our Supreme Court said: "Whatever danger existed was not only obvious but actually known and appreciated by plaintiff. He possessed all the information concerning the physical condition of the runway possessed by defendant or his employees, and knew of and appreciated the care required to be used therein . . ." The evidence in this case will not justify us in so declaring. Although proceeding cautiously, the plaintiff did not see or know of the extended carton which caused him to fall. He did not possess all the information concerning the physical condition of the

710

dock that was possessed by the defendant and its employees. A careful reading of the opinion in the Hitz case, *supra,* will be convincing that it is not decisive on the facts in this case.

So concluding, we hold that the court did not commit error in refusing to sustain the demurrer at the close of plaintiff's evidence, and there being no other errors assigned, it follows that the judgment of the trial court must be affirmed. It is so ordered. All concur.